# United States Court of Appeals
## For the First Circuit

No. 05-1670

UNITED STATES OF AMERICA,

Appellee,

v.

JESSE LEAHY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Selya, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

Michael R. Schneider, with whom Salsberg & Schneider was on brief, for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

January 19, 2007

**SELYA**, **Circuit Judge**. This appeal calls upon us to confront a question explicitly reserved in United States v. Diaz, 285 F.3d 92, 97 (1st Cir. 2002), concerning the allocation of the burden of proof when a criminal defendant in a federal felon-in-possession case attempts to exonerate himself by claiming that he took possession of the firearm purely in self-defense.[1] We hold that there is a justification defense available in felon-in-possession cases, which typically encompasses duress, necessity, and self-defense. Relatedly, we hold that where, as here, proof of the justification defense does not negate an element of the charged crime, the burden of proof in connection with that defense rests with the defendant. These holdings, coupled with our rejection of a variety of other proffered assignments of error, lead us to affirm the judgment below.

## I. BACKGROUND

While the factual scenario portrayed at trial is littered with testimonial conflicts and is at some points shrouded in ambiguity, the facts relevant to this appeal are comparatively straightforward.

On July 27, 2003, defendant-appellant Jesse Leahy, a convicted felon, had an altercation with a group of teenagers near

---

[1]The case at hand does not involve a claim of self-defense via-à-vis a law enforcement officer. Such cases may present special considerations and, thus, are beyond the scope of this opinion.

his mother's home in Kezar Falls, Maine. According to Leahy, he withdrew from the scene, but the youths followed him and attempted forcibly to enter his mother's house. Ostensibly fearing the maddened crowd, Leahy grabbed an Astra 9mm pistol that he knew his mother kept in a kitchen drawer. He emerged from the residence armed and confronted his tormentors.

During the ensuing imbroglio, Leahy admittedly fired the weapon. The protagonists' versions of what happened differ materially. Leahy asserts that he did no more than fire warning shots into the ground to scare away attackers who were attempting to inflict serious bodily injury on him. Other witnesses describe Leahy as the aggressor and assert that he chased after the youths, shot towards them, and pistol-whipped two of their number.

In all events, the youths fled. Once that occurred, Leahy went back into the dwelling and hid the gun. Police soon arrived at the scene. After a twelve-hour standoff, they entered the premises and arrested Leahy. A search revealed not only the hidden pistol but also a Marlin rifle stashed in a pantry closet. Male DNA profiles found on the rifle were consistent with those found on the pistol (although no DNA was specifically matched to Leahy). In due season, a federal grand jury handed up an indictment that charged Leahy with being a felon in possession of a firearm. See 18 U.S.C. § 922(g)(1). The indictment referenced both the pistol and the rifle.

Leahy's criminal record included felony convictions for assault and carrying a dangerous weapon. At trial, his then-counsel did not press for a stipulation that Leahy was a previously convicted felon (one exchange with the judge suggests that counsel may not have realized that he could compel the government to stipulate to this point). In the absence of a stipulation, the prosecutor was able to introduce independent evidence of the prior convictions.

Once both sides had rested, Leahy proffered a proposed instruction on self-defense — one that placed the burden of proof on the prosecution to disprove self-defense beyond a reasonable doubt. The government rejoined that the facts did not warrant a self-defense instruction. The district court took a middle path: over Leahy's objection, it gave an instruction on "justification" (defined so as to encompass self-defense), in which it told the jury, in effect, that Leahy's possession of a firearm would be justified (and, therefore, a guilty verdict would be unwarranted) if (i) Leahy was under an unlawful and present threat of death or serious bodily injury; (ii) he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct; (iii) he had no reasonable legal alternative but to engage in that conduct; and (iv) there was a direct causal relationship between his criminal conduct and the need to avoid the threatened harm. This instruction treated justification as an affirmative

defense, see United States v. Willis, 38 F.3d 170, 179 (5th Cir. 1994), and placed the burden on Leahy to prove that affirmative defense by a preponderance of the evidence.

Following deliberations, the jury found Leahy guilty. At the disposition hearing, the district court, finding that in the past Leahy had thrice been convicted of violent felonies, classified him as an armed career criminal. See 18 U.S.C. § 924(e). The court also determined that Leahy was subject to two separate sentencing enhancements, one for possessing the firearm in connection with an uncharged crime of violence and the other for obstruction of justice arising out of perjurious trial testimony. After making a series of other findings and computations, the court imposed a 262-month incarcerative sentence. This timely appeal followed.

## II. BURDEN OF PROOF

Leahy's flagship claim is that, once he had made a threshold showing of self-defense, the district court erred in requiring him to prove self-defense rather than requiring the government to negate his colorable claim. The proper allocation of the burden of proof on such a defense, however denominated, is an open question in this circuit with respect to felon-in-possession cases. See Diaz, 285 F.3d at 97. The Constitution permits us to answer this question either way; there is no constitutional requirement that the burden of disproving self-defense reside with

the prosecution. See Patterson v. New York, 432 U.S. 197, 210-211 (1977) (upholding murder statute that placed burden of proving affirmative defense on defendant when proof of that defense did not negate an element of the offense). Because the question turns on what is essentially a matter of statutory interpretation — what Congress intended — we afford de novo review. See United States v. Hartsock, 347 F.3d 1, 4 (1st Cir. 2003).

We introduce our analysis in case-specific terms. The principal issue at trial was whether Leahy, as a convicted felon, was legally justified in taking possession of the handgun. The government argued that Leahy was not so justified because he was the aggressor and, moreover, he was never under any realistic threat of imminent harm. Leahy, in contrast, argued that his bona fide fear of imminent harm justified him in taking possession of the handgun and defensively using it to repel his attackers. Cf. United States v. Holliday, 457 F.3d 121, 127 (1st Cir. 2006) (explaining that a felon possessing a gun to "avoid the imminent danger of his own death" is "the classic scenario in a self-defense case"). This issue calls into question whether justification is a defense to a felon-in-possession charge and if so, which party bears the burden of proof.

The federal felon-in-possession statute itself, 18 U.S.C. § 922(g), makes no express provision for any affirmative defenses. Thus, the logical starting place is the Supreme Court's recent

decision in <u>Dixon</u> v. <u>United States</u>, 126 S. Ct. 2437 (2006). There, the Court assumed arguendo that duress would be a viable defense to a section 922 charge[2] and, on that assumption, ruled that the defendant should bear the burden of proving duress. <u>Id.</u> at 2447. The Court noted that the court of appeals had distilled the defense into four elements. <u>See</u> <u>id.</u> at 2440 n.2. With one exception, discussed <u>infra</u> note 8, those four elements were nearly identical to the elements of "justification" delineated by the trial court in this case.

Although the <u>Dixon</u> Court, for this purpose, used the term "duress," that usage appears to have been a carry-over of the usage employed below. <u>See</u> <u>United States</u> v. <u>Dixon</u>, 413 F.3d 520, 525 (5th Cir. 2005) (using "duress" and "justification" interchangeably). This imprecision is understandable. Since the federal felon-in-possession statute does not explicitly admit of any affirmative defenses, courts have been able only to infer the availability of such defenses, though in appropriate circumstances they have not hesitated to do so. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Deleveaux</u>, 205 F.3d 1292, 1297 & n.7 (11th Cir. 2000) (collecting cases from six other circuits). We ourselves have intimated that, in appropriate

_____

[2]In <u>Dixon</u>, the charges were receiving a firearm while under indictment, 18 U.S.C. § 922(n), and making false statements in connection with the acquisition of a firearm, <u>id.</u> § 922(a). The Court did not discuss these charges separately, and the decision would appear to be fully applicable to violations of 18 U.S.C. § 922(g).

circumstances, we would recognize a justification defense to a federal felon-in-possession charge. See United States v. Holt, 464 F.3d 101, 107 & n.4 (1st Cir. 2006); see also Holliday, 457 F.3d at 127 (assuming, arguendo, the availability of a justification defense of self-defense in a § 922(g) case).

This inferential process, which requires courts to draw on common law doctrines, has produced confusion over nomenclature. See, e.g., United States v. Panter, 688 F.2d 268, 272 n.7 (5th Cir. 1982) (discussing whether "necessity" or "self-defense" is the appropriate label for a defense to a federal felon-in-possession charge). Many courts have sought to avoid this confusion by treating a compendium of common law defenses — duress, necessity, and self-defense — as interchangeable in this context (that is, in a felon-in-possession case in which proof of the affirmative defense will not negate any element of the charged crime) and lumping them under the rubric of "justification."[3] See, e.g., United States v. Beasley, 346 F.3d 930, 934-35 (9th Cir. 2003); see also Deleveaux, 205 F.3d at 1295 n.2 (collecting cases). Our canvass of the authorities elsewhere discloses that although some courts have performed separate self-defense and necessity analyses, see, e.g., United States v. Elder, 16 F.3d 733, 738-39 (7th Cir.

---

[3]One court has crafted an affirmative defense of "innocent possession," independent of any justification defense. See United States v. Mason, 233 F.3d 619 (D.C. Cir. 2000). We have rejected that taxonomy. See Holt, 464 F.3d at 107.

-8-

1994); see also Holliday, 457 F.3d at 127-28 & n.8 (discussing self-defense and necessity separately, but taking no position on whether those defenses could be viewed as interchangeable), no case holds that the burden of proof will vary automatically depending on whether duress, necessity, or self-defense is asserted.[4] We conclude, therefore, that ease in administration favors treating these three defenses, in a federal felon-in-possession case, under a single, unitary rubric: justification. This conclusion is important because it strongly suggests that Dixon — which, as we have said, placed the burden of proving duress on the defendant — bars Leahy's path.

In hopes of distinguishing Dixon, Leahy beseeches us to disambiguate self-defense from the broader category of justification. He emphasizes that the Dixon Court looked at the state of the law in 1968 (when Congress first conceived the federal felon-in-possession statute)[5] to help determine what allocation of

---

[4]In a post-argument letter, see Fed. R. App. P. 28(j), Leahy has directed us to a terse exchange between government counsel and the Supreme Court during oral argument in Dixon. That exchange raised the possibility of establishing different burden-of-proof allocations for duress and self-defense. Transcript of Oral Argument, Dixon v. United States, 126 S. Ct. 2437, 2006 WL 1194533, at *28-30 (2006). In our view, the mere fact that government counsel answered a hypothetical question in a manner advantageous to the government's position in Dixon has no precedential value for present purposes.

[5]The origin of section 922 can be found in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 922, 82 Stat. 197, 228. That statute included an early precursor to section 922(g)(1). See id. at § 922(f), 82 Stat. at 231.

the burden of proof Congress most likely would have chosen had it inserted a duress defense into the statutory text. See Dixon, 126 S. Ct. at 2445-47. He then asseverates, citing Mullaney v. Wilbur, 421 U.S. 684, 702 n.30 (1975), that the same methodology, if applied in this case, would favor placing the burden of proof on the prosecution because, in 1968, that was the majority rule in self-defense cases.

Leahy's premise is incorrect. Although seven Justices joined the opinion of the Dixon Court, Justice Kennedy wrote a concurring opinion that distanced him from the date-centric methodology employed in that opinion and wrote that, as a general matter, "we can assume that Congress would not want to foreclose the courts from consulting . . . newer sources and considering innovative arguments." Dixon, 126 S. Ct. at 2448 (Kennedy, J., concurring). Justice Alito, joined by Justice Scalia, also wrote a separate concurrence rejecting reliance on the date-centric methodology and stressing the value of looking to the state of the law "when Congress began enacting federal criminal statues." Id. at 2449 (Alito, J., concurring). Finally, Justice Breyer, joined by Justice Souter, wrote a dissent in which he argued that determination of the appropriate burden of proof allocation was a question of federal common law. Id. at 2450 (Breyer, J., dissenting) (explicitly declining to follow the date-centric approach). Thus, the most that we can glean from the several

opinions in Dixon is that the state of the law in 1968 is one possible source of enlightenment as to how Congress would have wanted to allocate the burden of proof had it explicitly created a justification defense to a felon-in-possession charge; other possible sources of enlightenment (such as the nature of the offense, the evolution of the defense and its accouterments when the Constitution was ratified, and generic policy considerations) must also be factored into the mix.

It can also be argued that, as an historical matter, self-defense circa 1968 was generally limited to assaultive crimes. See 2 Wayne R. LaFave, Substantive Criminal Law § 10.4(a), at 143 (2d ed. 2003); George E. Dix & M. Michael Sharlot, Criminal Law: Cases and Materials 776 (5th ed. 2002).[6]  This strong correlation between self-defense and assaultive crimes is evident from Leahy's citation to Mullaney.  See Mullaney, 421 U.S. at 702 (indicating that the discussion contained therein is intrinsically tied to cases involving the "commission of [a] homicide").  We think a powerful argument can be made that, had Congress meant to weave the common law of self-defense into the fabric of a non-assaultive offense like that created by the federal felon-in-possession

---

[6]While some modern innovation has expanded the breadth of self-defense, see, e.g., Boget v. State, 74 S.W.3d 23, 29-30 (Tex. Crim. App. 2002); see also Holliday, 457 F.3d at 127 (noting, in the present tense, that "self-defense is not limited to 'assaultive crimes'"), this relatively recent development is irrelevant to Leahy's argument about what the Congress that enacted section 922(g) in 1968 intended.

statute, it would have represented a radical departure from the mainstream of jurisprudential thought circa 1968 and, thus, would have warranted some explicit statement. To impute such an intention to Congress on the basis of the Dixon methodology alone would, therefore, make very little sense.

We need not dwell on the distinction between assaultive and non-assaultive crimes, for there is a more fundamental flaw in Leahy's thesis. The crimes historically associated with self-defense (homicide, for example) all carry substantial mens rea requirements. The federal felon-in-possession statute requires proof that the defendant knowingly possessed a firearm.[7] See United States v. Carpenter, 403 F.3d 9, 10 (1st Cir. 2005). Beyond that, however, 18 U.S.C. § 922(g) is a strict liability statute, which contains no specific mens rea element at all. See Dixon, 126 S. Ct. at 2447; Diaz, 285 F.3d at 97. Literally, the felon-in-possession statute encompasses both the felon who intentionally arms himself to rob a bank and the felon who frustrates the robbery by snatching the gun out of the robber's hand. This is a salient distinction: while an individual who kills another in self-defense lacks the malice required to support, say, a conviction for first-degree murder, a felon who knowingly takes possession of a firearm thereby satisfies every statutory element of the felon-in-

---

[7]The justification defense asserted by Leahy in this case does not go to knowledge; Leahy readily concedes that he knowingly seized the handgun.

-12-

possession offense regardless of whether he was motivated by concern for his own safety.

The absence of a mens rea requirement has obvious implications. In a felon-in-possession case (unlike in, say, an assaultive crime), evidence of facts concerning self-defense neither contradicts nor tends to disprove any element of the charged crime. Cf. Dixon, 126 S. Ct. at 2444 (reaching the same conclusion as to duress vis-à-vis similar section 922 violations). This means that disproving self-defense beyond a reasonable doubt is not inherent in the prosecution's burden of proving every element of the offense charged. See generally In re Winship, 397 U.S. 358, 364 (1970). So viewed, there is no good reason to eschew, in the felon-in-possession context, the burden allocation that affirmative defenses normally carry.

Most of the other courts that have considered this question have come to the same conclusion. Four of our sister circuits have squarely confronted the issue of allocating the burden of proof on a justification defense other than duress to federal felon-in-possession charges, where proof of the defense would not negate any of the elements of the charged crime. Three of the four have assigned the burden of proving such a defense to the defendant. See Beasley, 346 F.3d at 935; United States v. Dodd, 225 F.3d 340, 350 (3d Cir. 2000); Deleveaux, 205 F.3d at 1301. Although one respected court of appeals has held to the contrary,

see United States v. Talbott, 78 F.3d 1183, 1186 (7th Cir. 1996) (per curiam), we find the reasoning of Beasley, Dodd, and Deleveaux more persuasive.

Leahy argues that pragmatic considerations counsel in favor of assigning the burden of proof to the government. We think that these considerations tilt the other way. When self-defense is an issue in a felon-in-possession case, the defendant is likely to have greater access to the relevant facts than the government. See Deleveaux, 205 F.3d at 1300. While there always will be a witness when a defendant claims self-defense — the source of the alleged threat — that witness may or may not be available and, if available, may or may not be cooperative. For that reason, the defendant, himself a witness to the threat, is better positioned than the government to depict the circumstances under which he came into possession of the gun.

To sum up, we confirm the suggestion previously made in Holt and Holliday, and add our voice to the weight of authority by holding that, in some circumstances, justification — a term that we define to include, inter alia, self-defense — can comprise an affirmative defense to a federal felon-in-possession charge. Furthermore, we think it highly unlikely that Congress, in enacting the federal felon-in-possession law, intended to require the government to prove beyond a reasonable doubt the existence of a fact that it did not specify as an element of the offense.

Consequently, we hold that in a federal felon-in-possession prosecution, there is no sound basis for treating that defense differently from other justification defenses. It follows that a defendant who asserts self-defense in such a case must carry the devoir of persuasion on that defense by a preponderance of the evidence.

In that regard, we adopt the four-part framework for justification discussed by the Supreme Court in <u>Dixon</u>, 126 S. Ct. at 2440 n.2. That framework has been embraced by a number of other courts. <u>See</u> <u>Deleveaux</u>, 205 F.3d at 1297 (collecting cases). Here, the lower court used a version of that four-part framework and (apart from questioning the allocation of the burden of proof) Leahy has not challenged either the wording of the pertinent jury instruction or the sufficiency of the evidence underlying the jury's apparent rejection of justification as a defense.[8]

It is evident from what we have said that Leahy's principal claim of error fails. We think it is prudent, however, to add two caveats. First, this holding is limited to

---

[8]As to the second element of the framework, the court charged the jury that Leahy had to prove that he did not "recklessly" place himself in a situation in which he would be forced to engage in criminal conduct. The authorities are divided on the question of whether the second element extends to negligence as well as recklessness. <u>Compare</u>, <u>e.g.</u>, <u>Dixon</u>, 413 F.3d at 523 (including negligence along with recklessness), <u>with</u>, <u>e.g.</u>, <u>Beasley</u>, 346 F.3d at 933 n.2 (limiting the second element to reckless conduct). The case at hand does not require us to take sides in this debate.

justification defenses that do not go to the elements of the felon-in-possession offense. We leave open the possibility that a defense within the rubric of justification might negate an element of the felon-in-possession offense. In that event, the burden of disproving the defense would rest on the prosecution. Second, although we believe it is useful to speak of a single justification defense, we caution that different factual scenarios may require variations in the phrasing of the four-factor test. For example, the first factor, which requires that the defendant be under a present and unlawful threat of death or serious bodily injury, will require modification in cases in which the defendant allegedly acts in defense of a third party. Those nuances remain to be developed in future cases.

## III. UNANIMITY

The indictment in this case contained only a single count. That count mentioned two guns — the pistol and the rifle — and the government adduced evidence at trial about both weapons. The jury returned a general verdict. Based on this collocation of circumstances, Leahy suggests that he may have been convicted because some jurors believed that he possessed the rifle while others believed that he possessed the pistol but did not act in self-defense. To safeguard against this possibility, his thesis runs, the district court should have instructed the jury that

unanimity <u>as to the identity of the weapon unlawfully possessed</u> was required.

Leahy's concern for unanimity is of recent vintage: he did not request such an instruction below. The issue is, therefore, forfeited. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gomez</u>, 255 F.3d 31, 37 (1st Cir. 2001). As a forfeited issue, it may be reviewed on appeal only for plain error. <u>See</u> <u>id.</u>

The plain error hurdle is high. <u>United States</u> v. <u>Hunnewell</u>, 891 F.2d 955, 956 (1st Cir. 1989). To surmount it, an objector must make four showings: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001). Leahy cannot clear this four-tiered hurdle.

It is settled law that "Congress did not intend the possession of a particular firearm to be an element of a § 922(g)(1) violation." <u>United States</u> v. <u>Verrecchia</u>, 196 F.3d 294, 301 (1st Cir. 1999). Consequently, there is no need for unanimity within the relevant unit of prosecution, that is, with respect to weapons possessed "in one place at one time." <u>Id.</u> at 298.

Were this objection preserved, we would be forced to delve into the geography of the relevant unit of prosecution and determine whether the pistol (taken from a kitchen drawer one

evening) and the rifle (stowed in the pantry but perhaps handled at some indeterminate point) were sufficiently related in "time" and "place".  But the objection was not preserved, and <u>Verrecchia</u> is tenebrous as to the temporal and spatial contours of the "relevant unit of prosecution."  That combination defeats a claim that an <u>obvious</u> error occurred.  Hence, Leahy cannot satisfy the strictures of plain error review.

## IV.  INEFFECTIVE ASSISTANCE

Leahy next complains that his trial counsel did not offer to stipulate to the fact the he was a previously convicted felon — an omission that opened the door for the government to introduce evidence of the unattractive particulars of Leahy's prior misdeeds. Since the government would have had no choice but to enter into such a stipulation upon a timely request, <u>see</u> <u>Old Chief</u> v. <u>United States</u>, 519 U.S. 172, 174 (1997), this strategy does seem puzzling. The problem, however, is that this claim is newly advanced.  "We have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." <u>United States</u> v. <u>Mala</u>, 7 F.3d 1058, 1063 (1st Cir. 1993).

To be sure, there is a narrow exception to this rule for cases in which the record is adequately developed to permit reasoned consideration of the claim.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v.

-18-

<u>Natanel</u>, 938 F.2d 302, 309 (1st Cir. 1991). Here, however, that exception does not pertain. The record below contains nothing approaching an adequate elaboration of why counsel adopted the course that he followed (Leahy suggests that his lawyer did not know of the <u>Old Chief</u> decision, but that fact is not pellucid from the record), nor does it provide the district court's first-hand insights as to what (if any) quantum of prejudice might have attended this strategy. Given the need for further factfinding, we decline Leahy's invitation to address the ineffective assistance of counsel claim for the first time on direct appeal. Instead, we remit him, should he desire to pursue the matter, to his remedies under 28 U.S.C. § 2255. We intimate no view of the likely outcome of such a proceeding.

## V. SENTENCING

As a tail-end matter, Leahy raises three objections to his sentence. We address them sequentially.

### A. **Armed Career Criminal**.

As said, the district court sentenced Leahy under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). The court adopted this taxonomy after having found that Leahy's record included the necessary predicate: three prior convictions for violent felonies. <u>See</u> <u>id.</u> As a result of this determination, Leahy faced a fifteen-year mandatory minimum sentence, <u>see</u> <u>id.</u>, and

-19-

automatically incurred elevated criminal history and offense level placements, see USSG §4B1.4.

Pertinently, ACCA defines a "violent felony" as a crime punishable by "imprisonment for a term exceeding one year" that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Three such felony convictions are required to trigger the statute, and Leahy asserts that one of his three prior convictions — namely, a Massachusetts conviction for indecent assault and battery, see Mass. Gen. Laws ch. 265, § 13H[9] — does not qualify and, therefore, ACCA does not apply.

The determination of whether a particular crime is a violent felony is a question of law and, thus, engenders de novo review. See United States v. Bishop, 453 F.3d 30, 32 (1st Cir. 2006). The question here is whether Leahy's indecent assault and battery conviction is for a crime that "presents a serious potential risk of physical injury to another." We agree with the sentencing court that the conviction meets this definition.

---

[9]The provision reads in relevant part:

> Whoever commits an indecent assault and battery on a person who has attained age fourteen shall be punished by imprisonment in the state prison for not more than five years, or by imprisonment for not more than two and one-half years in a jail or house of correction.

-20-

The methodology for deducing whether a given offense constitutes a violent felony derives from Taylor v. United States, 495 U.S. 575 (1990). We take a categorical approach, looking to the fact of conviction and the statutory definition of the offense. Id. at 602. If a statute encompasses acts that could constitute both violent and non-violent felonies, we may also look to certain materials particular to a given case (such as the charging document and jury instructions). See id.; see also Shepard v. United States, 544 U.S. 13, 26 (2005).

The district court concluded that, under this approach, all section 13H convictions were convictions for violent felonies. In reaching this conclusion, the court relied heavily on Sutherland v. Reno, 228 F.3d 171, 177 (2d Cir. 2000), in which the Second Circuit found, in an immigration proceeding, that a conviction under section 13H was a conviction for a "crime of violence." For the Sutherland court, the pivotal fact was that "lack of consent is . . . a requisite element of a § 13H violation." Id. at 176 (citing Maghsoudi v. INS, 181 F.3d 8, 15 (1st Cir. 1999)). Since "the crime involves a non-consensual act upon another person, there is a substantial risk that physical force may be used in the course of committing the offense." Id. (quoting United States v. Reyes-Castro, 13 F.3d 377, 379 (10th Cir. 1993)).

Leahy attempts to distinguish Sutherland by noting that the opinion deals with the definition of "crime of violence" found

-21-

in 8 U.S.C. § 16(b). Building on that foundation, he points out that while ACCA's definition of "violent felony" has been deemed substantively identical to the definition of "crime of violence" used in the federal sentencing guidelines, see United States v. Jackson, 409 F.3d 479, 480 n.1 (1st Cir. 2005), both the Supreme Court and this court have distinguished section 16(b) from the pertinent guidelines provision, USSG §4B1.2, on the ground that the former is concerned with a risk of force whereas the latter is concerned with risk of injury. See Leocal v. Ashcroft, 543 U.S. 1, 10 n.7 (2004); Aguiar v. Gonzales, 438 F.3d 86, 88 (1st Cir. 2006). Leahy deploys the transitive property to reach the conclusion that ACCA must also be distinguishable from section 16(b). He then argues that while indecent assault and battery may entail a substantial risk of force, offensive touching does not entail a serious risk of physical injury.

Leahy's argument does not withstand scrutiny. To begin, both Leocal and Aguiar treat section 4B1.2 as reaching conduct beyond the scope of section 16(b). See Leocal, 543 U.S. at 10 n.7; Aguiar, 438 F.3d at 88. Neither decision in any way suggests that the reverse is true. Moreover, even if one can conceive of a risk of force bereft of a corresponding risk of injury, the logic of Sutherland still would compel the result reached by the district court. After all, just as there is "a substantial risk that force may be used in order to overcome the victim's lack of consent,"

-22-

Sutherland, 228 F.3d at 176, so too is there a substantial risk of physical injury from the unwanted touching.[10]

This conclusion is buttressed by our decision in United States v. McVicar, 907 F.2d 1 (1st Cir. 1990). There, we held that a statute encompassing the crime of pickpocketing satisfied section 4B1.2 because "[t]aking property directly from a person seems to us to run a 'substantial' or 'serious' risk that 'physical force' or 'physical injury' will follow." Id. at 2. If the risk of injury presented by pickpocketing — a crime in which the perpetrator's goal is to leave his victim unaware of the contact — satisfies section 4B1.2 (and, by extension, ACCA), it seems inescapable that the risk of physical injury posed by a crime in which the touching is the end, not merely the means, would likewise entail the necessary degree of risk.

Leahy makes much of the fact that Massachusetts does not include indecent assault and battery in its own list of "sexually violent offenses." See Mass. Gen. Laws ch. 6, § 178C. That fact is of little moment. "Because a state's classification of a crime generally reflects different policy considerations than the federal classification, it is simply not relevant to the determination of

_____

[10]Both sides debate the significance to this issue of our decision in United States v. Sherwood, 156 F.3d 219 (1st Cir. 1998). However, that case involved a child molestation statute and the opinion is largely focused on the special vulnerability of young children. See id. at 221-22. With respect to the case at hand, we think that the logic used in Sutherland hits closer to home.

whether a crime is a 'violent felony,' which, under federal law, is based on an assessment of the risk of physical injury associated with the typical conduct underlying that crime." United States v. Sacko, 247 F.3d 21, 25 (1st Cir. 2001).

The short of it is that the lower court correctly sentenced Leahy as an armed career criminal.

## B. **Judicial Factfinding**.

When a defendant is found to be an armed career criminal, USSG §4B1.4 applies to his case. By reason of that paradigm, the defendant faces increases in both his offense level and his criminal history category if he is found to have used or possessed the firearm in connection with a crime of violence (whether charged or uncharged). See Holliday, 457 F.3d at 130. Applying this guideline, the district court found, under a preponderance of the evidence standard, that Leahy, during his interactions with the gaggle of teenagers on July 27, 2003, had committed the uncharged state crimes of aggravated assault and reckless conduct. See Me. Rev. Stat. Ann. tit. 17-A, §§ 208, 211. The court upwardly adjusted Leahy's offense level and criminal history category accordingly.

Leahy argues that, under the Sixth Amendment, he was entitled to have these determinations made by a jury beyond a reasonable doubt. He frankly acknowledges that this argument contradicts the combined holding of United States v. Watts, 519

U.S. 148, 157 (1997) (per curiam), and <u>Almendarez-Torres</u> v. <u>United States</u>, 523 U.S. 224, 226-27 (1998).  He nonetheless posits that they have not survived the decision in <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005).

This argument need not detain us.  We have recently held in precisely analogous circumstances (involving a USSG §4B1.4 enhancement predicated upon an uncharged crime of violence) that "even after <u>Booker</u>, [there is no need that] the facts underlying the enhancement be found by a jury.  Under the advisory guidelines regime, the district court can use the preponderance of the evidence standard to determine whether an enhancement applies." <u>Holliday</u>, 457 at 130.  This holding obliterates Leahy's objection.

## C.  **Obstruction of Justice**.

Finally, Leahy objects to a two-level sentencing enhancement for obstruction of justice.  <u>See</u> USSG §3C1.1.  In his view, the enhancement rests on shaky ground because the sentencing court did not make findings that identified perjurious statements with particularity.  <u>See</u> <u>United States</u> v. <u>Dunnigan</u>, 507 U.S. 87, 98 (1993).

Our review of the record indicates that the district court in fact identified some aspects of Leahy's testimony that it found incredible.  Still, it is unnecessary to probe that point; the short, dispositive rejoinder to Leahy's plaint is that any error was harmless.  We explain briefly.

-25-

On the basis of its determination that Leahy had obstructed justice, the district court adjusted his offense level from 28 to 30. This adjustment became irrelevant, however, when the court found Leahy to have been an armed career criminal who possessed a firearm in connection with an uncharged crime of violence. See supra Parts V(A)-(B). That finding triggered an overriding offense level of 34, which came into play without regard to other enhancements. See USSG §4B1.4(b). The superimposition of this enhancement rendered the putative enhancement for obstruction of justice moot. See United States v. Cruz, 156 F.3d 22, 29-30 (1st Cir. 1998).

## VI. CONCLUSION

We need go no further. For aught that appears, Leahy was fairly tried, justly convicted, and lawfully sentenced. Consequently, we uphold the conviction and sentence, without prejudice, however, to Leahy's right, should he so elect, to revive his ineffective assistance of counsel claim on collateral review.

**Affirmed**.

-26-